Kissandra L. Tysman
State Bar of Arizona # 24577
TYSMAN LAW FIRM PLC
5616 East McKellips Road
Suite 101
Mesa, Arizona 85215-2763
Tel: (480) 654-6540
Fax: (480) 654-6544
E-mail: tysman@legaljustice.com
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Robin P. Petersen, | |
| Plaintiff, | Case # |
| vs. | |
| The Boeing Company, a Delaware corporation, and Boeing International Support Systems Company, Saudi Arabia Limited, a corporation or other business entity or division of The Boeing Company, | **CIVIL COMPLAINT AND DEMAND FOR TRIAL BY JURY** |
| Defendants. | |

Plaintiff Robin P. Petersen, by and through Kissandra L. Tysman, Tysman Law Firm, PLC, seeks relief in this Complaint and Demand for Trial by Jury against the above captioned Defendants, jointly and severally, on his claims for (1) Confiscation of Passport in Violation of 18 U.S.C. 1592(a); (2) RICO, 18 U.S.C. 1961 et seq.; (3) False Imprisonment (a common law tort claim); (4) Breach of Contract (a common law claim); (5) Common Law

Fraud (a tort claim); (6) Intentional Infliction of Severe Emotional Distress; and (7) Failure to Pay Wages in violation of A.R.S. 23-350 through 355.

This Complaint and Demand is filed pursuant to Federal Rules of Civil Procedure, Rules 3, 7(a)1, 8(a) and 38(a, b).

## FACT ALLEGATIONS AND JURISDICTION

1. The Plaintiff, Robin P. Petersen is, and has been at all times material to this Complaint, an adult resident of Maricopa County, Arizona.

2. Defendant "The Boeing Company" ("TBC") is a Delaware corporation with its headquarters in Chicago, IL. It has offices and operations in Mesa, Arizona.

3. Defendant "Boeing International Support Systems Company, Saudi Arabia Limited" ("BISS") is a wholly owned subsidiary of TBC or a division within TBC, and is described as such on the TBC website. BISS acted in Arizona through TBC, its agent, joint venturer, and joint employer.

4. Counts one and two of this Complaint arise from and are based upon federal law, to-wit: 28 U.S.C. 1592(a) (count one), and RICO, 18 U.S.C. 1961 et seq. (count two). Counts three through seven arise under the law of Arizona. This Court has jurisdiction over Mr. Petersen's claims in counts one and two pursuant to 28 U.S.C. 1331, and has supplemental jurisdiction over counts three through seven pursuant to 28 U.S.C. 1367(a).

5. This Court also has diversity jurisdiction over all seven counts in this Complaint pursuant to 28 U.S.C. 1332 because (a) both Defendants are citizens of states other than Arizona, and (b) the amounts sought herein by Mr. Petersen against the Defendants far exceed $75,000.00, exclusive of interest and costs.

6. Mr. Petersen is a retired United States Navy Commander, who served as a naval aviator and has extensive international flight experience as an "Aircraft Commander" piloting Lockheed C-130 Hercules, a large military transport aircraft. After retiring from the U.S. Navy, he was employed as a commercial airline pilot by Southwest Airlines.

7. In 2008, and upon information and belief, through the present date, TBC and BISS have solicited throughout the U.S. for experienced pilots who could perform pilot training for the Saudi Air Force as part of a United States State Department TAA (Technical Assistance Agreement) contract that TBC and BISS had with the Saudi government wherein TBC and BISS provided both aircraft maintenance and pilot training for the Saudi Air Force C-130 program. TBC and BISS have jointly employed agents who have contracted on their behalf with Mr. Petersen while purporting to represent both entities.

8. In seeking new employment after working for Southwest Airlines in late 2008, Mr. Petersen went to the Boeing website and saw a job listing (requisition #CW-159, for a "C-130 Flight/Simulator Instructor in Riyadh, Saudi Arabia"). He responded to the Boeing website job posting, and was then recruited by TBC and its wholly owned subsidiary, BISS, for employment in Saudi Arabia to provide training to Saudi Arabia Royal Air Force Pilots as a "Flight/Simulator Instructor" for C-130 Aircraft through the TBC and BISS offices in Oklahoma City, Oklahoma.

9. After oral and written negotiations and submission of volumes of documents between TBC and Mr. Petersen in Arizona, he was given a firm offer of employment, a one-page document titled "BISS Subsidiary Employee Acknowledgement," which he signed on November 20, 2008, and returned to TBC and BISS.

10. Pursuant to that November, 2008 contract, Mr. Petersen arrived in Riyadh, Saudi Arabia on January 22, 2009, to commence his employment. The next day, January 23, 2009, he was met by Shaun A. Ford, who identified himself as "The Boeing Company Operations Manager" for the Kingdom of Saudi Arabia, and was told that (1) he would be assigned to work for TBC/BISS at Jeddah, not Riyadh as was stated in the original Boeing job requisition, and (2) he had to sign a second employment contract then and there, and that if he failed to do so, he would have to return to the U.S. at his own expense and would receive no compensation. He was not allowed to have sufficient time to read it or ask any questions about it, and told to sign it immediately and initial each page.

11. The contract (paragraph ten supra) was a pre-printed boiler-plate form, five pages long, with Mr. Petersen's name, job title, and dates of employment (1-23-09 to 1-31-10) typed or handwritten on the contract form. Attached to the 5 page contract was another 8 pages of addendums that Mr. Petersen was told to also sign without reading. They were:

   A. The Boeing Company Acknowledgement for New Employees

   B. Avoiding Conflicts of Interest at Boeing

   C. The Boeing Company and Subsidiaries Intellectual Property and confidentiality agreement

   D. Boeing Export Control Compliance Verification Form

   E. 2009 Boeing Code of Conduct

   F. The Boeing Ethical Business Conduct Guidelines which included a letter written by the Boeing CEO, James McNerney, Jr.

   G. Addendum A to Employment Agreement C-130 Technical Support Program

12. Mr. Ford asked Mr. Petersen to sign these documents quickly because he wanted him to speak with his security agent then about certain risks in Saudi Arabia, and because he also had to get to the airport right away for transportation to Jeddah. Mr. Petersen did not want to disobey the direct orders of his new supervisor, to sign the contract and addendums immediately without reading them, so he did so. Mr. Petersen then spoke with the security agent while Mr. Ford left for a few minutes, and then returned and gave Mr. Petersen a photocopy of the contract documents he had just signed.

13. The terms of employment promised by TBC and BISS included a base salary of $94,944.00 per year plus additional compensation and benefits, including health insurance, life insurance, and free housing. Daniel J. Nelson, a TBC and BISS Manager, specifically promised Mr. Petersen that, since he was a retired senior military officer, he would have a single occupancy villa (free-standing well furnished spacious living quarters) plus the use of a car on a shared basis.

14. Mr. Petersen was assigned to work and live at a TBC and BISS facility at Jeddah. When Mr. Petersen arrived in Jeddah, TBC and BISS housing coordinator Dawood Abdullah Brown confiscated Mr. Petersen's passport and thereafter refused to return it to Mr. Petersen despite his many demands that his passport be returned to him. Without his passport, Mr. Petersen was virtually a prisoner at the TBC and BISS Jeddah compound because he could not travel anywhere without either his passport or a Saudi issued "Iqama." An Iqama is a Saudi document that proves that the holder is a legal resident of the country, and may travel freely, and is thus an "internal passport" and gives the foreign holder most privileges that the Saudis enjoy. Without an Iqama, Mr. Petersen could not

1  travel, could not purchase many items of value beyond the bare necessities
2  of life, could not buy or rent a car, could not get a driver's license, open a
3  bank account or obtain any kind of insurance. Mr. Petersen could not
4  obtain an Iqama except through TBC and BISS. TBC and BISS never
5  provided Mr. Petersen with the Iqama, the entire time he was in country (six
6  months), and refused to let him have his passport as well, effectively
7  making him a prisoner within the TBC and BISS premises in Jeddah.

8      15.  Mr. Petersen was given an apartment at a rundown slum-like
9  building in Jeddah, accessible only by climbing four flights of stairs, called
10 the "Mohammedya Compound" in Jeddah, which had inadequate air
11 conditioning, no elevator, and unhealthy and filthy conditions. It was only
12 approximately 700 to 800 square feet in size. There was a large cavity in
13 the wall of his apartment which apparently was a space for a portable
14 (window) air conditioner. This opening was allowing dust, sand, bugs, and
15 birds to enter the apartment, which was plastered with bird feces inside,
16 mold and deteriorating walls. The two toilets were broken, there was no
17 toilet paper to be found, the beds were filthy and unmade, there was the
18 smell of something dead, there were no towels in the bathroom to use after
19 having to take a cold shower (as no hot water was supplied), and there was
20 no cleaning equipment/supplies to be found. There was no hot water
21 available in the kitchen or in the bathroom. There were no dishes, pots,
22 pan, or utensils. Mr. Petersen had been promised a "soft pack" which was
23 to include silverware, towels, toilet paper, cleaning supplies, and dishes,
24 but none was provided during his first two weeks in Jeddah. There was a
25 washer and a dryer in the middle of the living room floor, but both were
26 broken and inoperable. The refrigerator did not work properly, allowing
27
28

1  food to rot or spoil. Mr. Petersen took some photos showing these unsafe,
2  decrepit and unsanitary conditions.
3      16.    Mr. Petersen's repeated complaints to TBC and BISS about
4  these poor housing conditions, including sand and dust inside his
5  apartment, were ignored and he became sick from having to live in these
6  conditions. He developed an upper respiratory illness that caused
7  coughing, sinus congestion, and weakness. He was treated at the TBC
8  and BISS on-site clinic with medications including Cipro, an antibiotic.
9      17.    The next morning, January 24, 2009, was Mr. Petersen's first
10 day on the job. He was taken by bus to the air base and dropped off in
11 front of the Royal Saudi Air Force 20th Squadron, where he was assigned
12 to work. He was taken to a room that was labeled as the Technical
13 Support Program ("TSP")/Curriculum Development Department. There he
14 met an American who was working alone as a clerk in that office, Gary
15 McGlincy. Mr. McGlincy was straight forward and told Mr. Petersen that
16 the TBC and BISS operation was a fraudulent scheme being run by TBC
17 and BISS and the Alsalam Aircraft Company. He said that many foreign
18 employees had already departed Saudi Arabia after suffering terrible living
19 conditions, intimidation, abuse and false promises made by
20 the TBC/BISS/Alsalam companies. Mr. McGlincy told Mr. Petersen that
21 he and others had been cheated out of their salaries and there was a lot of
22 hate and discontent building up over how everyone there was being
23 treated. Mr. McGlincy stated that he was trying to make arrangements to
24 get out of the country. He told Mr. Petersen that he would soon be meeting
25 another pilot by the name of Jack Flanders who worked in flight operations,
26 and that Mr. Flanders would "fill him in" on what was taking place in
27 Jeddah.
28

18. Mr. Petersen then met Jack Flanders who told him that the TBC/BISS/Alsalam operation was a "fraudulent operation." Mr. Flanders stated that he had been cheated out of thousands of dollars by the previous company (DIFFA) who had the contract before TBC and BISS took over the C-130 operations nearly a year prior. Mr. Flanders stated that everything was in a state of chaos, in terms of the way management was running the operation in Jeddah. He told Mr. Petersen that a scheme TBC and BISS had going, was to keep employees in-country for at least ninety days so that they would be paid by the Royal Saudi Air Force for the cost of one's salary (90 days of pay) and for the cost of expenses for bringing the employee overseas to Saudi Arabia. Mr. Flanders also told Mr. Petersen that, once ninety days had passed, TBC and BISS "didn't care what happened to the employee as long as they got paid."

19. Mr. Petersen later met other employees, in particular, Pakistanis who had been working for TBC and BISS for over fifteen months, who had their passports taken from them and who were never provided with a Saudi Iqama. These Pakistanis were being housed in rooms that had as many as six to a room. They hadn't been properly paid and they had been trying to return to their own country for months, without success, because TBC and BISS were withholding their passports and not providing them with an exit visa which was required to leave Saudi Arabia.

20. Approximately two weeks after Mr. Petersen had arrived in Jeddah, late at night, Mr. Dawood Brown (BISS housing coordinator) and Mr. Terry Vipperman (a fellow Navy veteran) showed up at Mr. Petersen's dingy apartment and told him that Mr. Vipperman was moving in as Mr.

Petersen's roommate. This was contrary to the single occupancy villa that Mr. Nelson had promised Mr. Petersen, supra.

21. TBC and BISS failed to pay Mr. Petersen certain sums that he was entitled to under the contract, including the promised signing bonus and reimbursable expenses, despite his requests. One of their many breaches was their failure to assist Mr. Petersen to obtain from the Saudi government an Iqama, so that he could travel freely and purchase the many things he needed which required an Iqama (or Saudi citizenship).

22. While working for TBC and BISS in Jeddah, Mr. Petersen observed a pattern of dishonesty and corruption that were clearly contrary to "The Boeing Ethical Business Conduct Guidelines" (which he had been given by Mr. Ford with his contract on January 23, 2009 when he arrived in Riyadh), including the following:

A. Signing off on safety inspections that had not in fact been performed on aircrafts in violation of contract and safety requirements.

B. Failure to perform required non-destructive inspections (x-rays) of aircraft components and control surfaces to discover cracks or defects or structural weakness in the aircraft in violation of contract and safety requirements.

C. False certifications that personnel being trained had performed at certain levels, e.g. flight performance grading sheets were typed up with outstanding grades, in advance of testing.

23. Based upon these breaches of the employment contract violations, safety violations, and dishonest practices of TBC's and BISS' own published "Ethical Business Conduct Guidelines," fraud, unhealthy living conditions, and unlawful conduct, Mr. Petersen submitted his written resignation to TBC and BISS on March 9, 2009 to be effective March 24,

2009. He again demanded the return of his U.S. passport so that he could leave on that date, but TBC and BISS refused to accept or process his resignation because, unknown to Mr. Petersen when he signed the contracts, the TAA contract that TBC and BISS had with the Saudi government provided that TBC and BISS would get no payment for the work performed by any foreign contract employee (such as Mr. Petersen) who did not remain employed in Saudi Arabia for at least ninety days.

24. TBC and BISS did not act upon Mr. Petersen's resignation because they wanted to keep Mr. Petersen on-site for at least ninety days because they would not get reimbursed for the salary and expenses by the Saudi government for any employee who did not remain employed there for at least ninety days.

25. On March 28, 2009, four days after he had planned to have his resignation become effective (and leave Saudi Arabia to return to the U.S.) Mr. Petersen was exercising when he suffered a torn Achilles tendon which required surgical treatment. Mr. Petersen had been promised free health insurance in his contract, and planned to get the treatment as soon as he returned to the United States. TBC and BISS had given him two health insurance cards, both expiring on 2-2-2010 (when his one-year contract was due to expire). One card was for MEDEX, health insurance coverage in the U.S. The other card was for coverage in Saudi Arabia and the listed policy holder was "Alsalam Aircraft Co."

26. On April 1, 2009, Mr. Petersen complained in writing again to Mr. Ford about the failures of TBC and BISS to live up to the contract terms, it's refusal to process his resignation, and his need to get to the U.S. for treatment of his injury.

27. Mr. Ford came to see Mr. Petersen on April 7, 2009 and told him that his health insurance coverage for the U.S. was not valid, and the only coverage he had was for treatment in Saudi Arabia. He further stated that he would have no coverage at all unless he rescinded his March 9, 2009 resignation letter, and if he did so, he could be treated by a local Saudi doctor under the TBC and BISS Saudi coverage.

28. Since he was suffering, had no Iqama or passport, and needed treatment for his torn tendon, Mr. Petersen was forced to submit to treatment by a Saudi doctor because TBC and BISS would not give him his passport or an Iqama (in which to obtain an exit visa) so he could not leave the country of Saudi Arabia, and was being held against his will in Saudi Arabia by TBC and BISS. Mr. Petersen needed medical attention for his torn Achilles. (He was injured on March 28, 2009, and did not undergo surgery until April 18, 2009, three weeks after the injury.) Boeing had total control over him and at that time, he had no options, except to try and get healthy so that he could reattempt his efforts leave Saudi Arabia and get the contract compensation he had been promised.

29. The Saudi doctor provided to Mr. Petersen through TBC and BISS performed a botched surgery on Mr. Petersen's tendon on April 18, 2009, three weeks after he had been injured, unnecessarily cutting open his leg vertically from his heel to the base of his calf, leaving a conspicuous scar. This malpractice caused Mr. Petersen continuing pain, suffering, partial disability, and further medical expenses that he incurred once he returned to the U.S. and was able to get satisfactory medical care (from Michael A. Seivert, D.O.). Mr. Petersen, who participated in college and professional sports, is still unable to walk correctly as a result of the surgery

that has left him partially disabled. He suffers extreme pain in his left leg, foot, ankle, and lower back.

30. After the surgery, Mr. Petersen had to return to his assigned living quarters, the small apartment that could only be reached by crawling up four flights of stairs, which was very difficult and painful with his torn tendon. He was extremely weak and could hardly breathe, as he was still suffering from the intubation procedure and the affects of the surgical anesthetics.

31. TBC and BISS made no accommodations for Mr. Petersen and refused to provide transportation for the follow up care that he needed, despite his written requests for accommodations and assistance. He became totally dependent upon the gratuitous assistance of his roommate, Terry Vipperman, Jack Flanders, and the kindness of an Ethiopian woman, Tigist Asseffa, who also helped him.

32. On April 23, 2009, TBC and BISS let Mr. Petersen's work visa and base pass expire, although he had notified them in writing and in advance to have these documents renewed. Without proper documentation, Mr. Petersen was subject to arrest if caught outside the TBC and BISS compound in Jeddah.

33. TBC and BISS would not process Mr. Petersen's resignation first submitted on March 9, 2009 or give him the documents he needed to return to the U.S., and on May 30, 2009, did not pay him his monthly pay as promised under his contract.

34. On June 2, 2009, Mr. Petersen sent a letter via FedEx to Mr. James McNerney Jr., the CEO of TBC, describing his plight and the misconduct by TBC and BISS. The letter was received by Mr. McNerney

1  on June 5, 2009, but neither he nor anyone at TBC/BISS responded to this
2  letter.
3       35.   On June 3, 2009, Mr. Petersen sent another letter to Mr. Ford,
4  informing that TBC and BISS were in breach of contract, and demanding
5  that his passport, Iqama, and exit visa be produced so he could return to
6  the United States in order get proper treatment for his tendon injury. He
7  also contacted the local U.S. Consulate office, who in turn ordered TBC
8  and BISS to provide Mr. Petersen with his passport and the documents
9  necessary so that Mr. Petersen could lawfully exit Saudi Arabia. Three
10 days later, on June 6, 2009, TBC and BISS provided the necessary
11 documents in response to a demand made by the U.S. Consulate (by Mr.
12 Ty Mendro). TBC and BISS had failed to provide to Mr. Petersen his U.S.
13 Passport prior to this time, making him a virtual prisoner at the TBC and
14 BISS Jeddah compound for several months.
15      36.   Mr. Petersen was able to make arrangements to fly out of
16 Jeddah and leave the country two days later, on June 8, 2009. His efforts
17 to get the compensation he was entitled to, were all refused by TBC and
18 BISS, and he has had to retain counsel (his undersigned attorney in Mesa,
19 AZ).
20      37.   TBC and BISS have engaged in the same pattern of fraudulent
21 and illegal conduct with other U.S. military veterans, including inter alia:
22 A. Robert J. Brown, U.S. Air Force, C-130 Load Master
23 B. Terry Vipperman, U.S. Navy, C-130 Flight Engineer
24 C. Johnny Carroll, U.S. Air Force, C-130 Load Master
25 D. Oscar Ortega, U.S. Air Force, C-130 Simulator Technician
26 E. Darrel Edwards, U.S. Air Force, C-130 Aircraft Maintenance
27 F. Thomas Naugle, U.S. Air Force, C-130 Aircraft Maintenance
28

1. G. Robert Aponte, U.S. Army, C-130 Aircraft Maintenance
2. H. Kenneth Maynard, U.S. Air Force, C-130 Aircraft Maintenance
3. I. Skip Bunner, U.S. Air Force, C-130 Aircraft Maintenance
4. J. Willie Hunter, U.S. Air Force, C-130 Aircraft Maintenance
5. K. Gary McGlinchy, U.S. Air Force, Technical Support Program
6. L. Joe Bianchino, U.S. Air Force, C-130 Aircraft Maintenance
7. M. Victor Cook, U.S. Air Force, C-130 Aircraft Maintenance
8. N. Jack Flanders, U.S. Air Force, C-130 Pilot, Technical Support Program

38. TBC and BISS are jointly liable to Mr. Petersen for the following sums for breach of the employment contract:

A. Unpaid wages and benefits totaling $71,208.00 ($7,912.00 x 9 months - May 2009 thru January 2010)

B. The signing bonus of $1,000 he was to be given when he arrived in Saudi Arabia to commence his employment

C. Unreimbursed expenses totaling $1,179.07

D. Vacation pay (10 days) totaling $2,660.00

E. Medical costs incurred in the U.S. for Mr. Petersen's tendon injury while employed by TBC and BISS that should have been paid or covered by the health insurance promised in the employment contract. Since returning to the U.S., he has been treated by orthopedic surgeon Michael A. Seivert, D.O., Suite 104, 4840 East Indian School Road, Phoenix, AZ 85018

F. Costs of his continuing mental health treatment for his psychological harm (chronic acute depression and post-traumatic stress syndrome) suffered as a result of his mis-treatment, injury (which did not receive proper medical care) and virtual incarceration at the TBC and BISS compound in Saudi Arabia, which intentional conduct by the Defendants

caused him to suffer severe emotional distress. He has had both in-patient and out-patient treatment since returning to the U.S.

G. Mr. Petersen's total medical expenses for E and F supra (to date of this Complaint) are $34,478.95

39. As the direct and proximate result of the conduct of TBC and BISS alleged herein, Mr. Petersen has suffered damages including, inter alia, depression, humiliation, embarrassment, and the loss of income which continues to the present date. Since returning to the U.S., Mr. Petersen has made diligent efforts to find new suitable employment but has been unsuccessful, primarily because of (a) his injury from his botched surgery in Saudi Arabia supra, (b) the fact that he was forced to resign from his last job with TBC and BISS, and (c) high unemployment in the local area (Phoenix) where he resides and a shortage of pilot jobs.

40. Mr. Petersen had reasonably relied upon the promises of TBC and BISS with respect to compensation, working conditions, and living conditions, in signing the employment contract documents presented to him by TBC and BISS, but he suffered harm and detriment when some of those promises later turned out to be false, including inadequate housing, inadequate medical treatment, non-payment of promised compensation, and being made a virtual prisoner by the Defendants' conduct in confiscating his passport and refusing to arrange to obtain or to provide him with a Saudi issued Iqama which effectively prohibited Mr. Petersen from leaving the TBC and BISS property in Saudi Arabia and from returning to the U.S. when he chose to.

41. The conduct of the Defendants alleged herein was done with a deliberate and evil intent to harm Mr. Petersen, to defraud the Saudi government, and to provide substandard services to that government.

42. The conduct of the Defendants alleged herein was done as an enterprise engaged in "racketeering" as defined by 18 U.S.C. 1961(1) B because such conduct was a pattern of violations of secs. 1581 and 1583 (prohibiting peonage), sec. 1589 (prohibiting forced labor), sec. 1590 (trafficking with respect to peonage, involuntary servitude or forced labor), and 18 U.S.C 1592 (confiscation of passport of another).

## DEMAND FOR TRIAL BY JURY

The Plaintiff demands a trial by jury, pursuant to the U.S. Constitution Seventh Amendment, and Federal Rules of Civil Procedure Rule 38 (a,b).

## RELIEF REQUESTED

Based upon the foregoing, Plaintiff Mr. Petersen respectfully requests judgment and orders granting him the following relief against Defendants TBC and BISS, jointly and severally, on his seven claims:

## COUNT ONE: Confiscation of Passport in Violation of 18 U.S.C. 1592(a)

1. Damages in an amount to be determined by the trier-of-fact.

2. Taxable costs pursuant to 29 U.S.C. 216(b), 28 U.S.C. 1920, and Federal Rules of Civil Procedure, Rule 54(d)1.

## COUNT TWO: RICO, 18 U.S.C. 1961 et seq.

1. Damages in an amount to be determined by the trier-of-fact, trebled pursuant to 18 U.S.C. 1964(c).

2. Reasonable attorneys fees pursuant to 18 U.S.C. 1964(c) and Federal Rules of Civil Procedure, Rule 54(d)2.

   3. Taxable costs pursuant to 29 U.S.C. 216(b), 28 U.S.C. 1920, and Federal Rules of Civil Procedure, Rule 54(d)1.

### COUNT THREE: False Imprisonment (a common law tort claim)

   1. Damages in an amount to be determined by the trier-of-fact

   2. Punitive damages in an amount to be determined by the trier-of-fact

   3. Taxable costs pursuant to 29 U.S.C. 216(b), 28 U.S.C. 1920, and Federal Rules of Civil Procedure, Rule 54(d)1.

### COUNT FOUR: Breach of Contract

   1. Damages in an amount to be determined by the trier-of-fact

   2. Reasonable attorneys fees pursuant to A.R.S. 12-431.01(A) and Federal Rules of Civil Procedure, Rule 54(d)2.

   3. Taxable costs pursuant to 29 U.S.C. 216(b), 28 U.S.C. 1920, and Federal Rules of Civil Procedure, Rule 54(d)1.

### COUNT FIVE: Common Law Fraud

   1. Damages in an amount to be determined by the trier-of-fact.

   2. Punitive damages in an amount to be determined by the trier-of-fact.

   3. Taxable costs pursuant to 29 U.S.C. 216(b), 28 U.S.C. 1920, and Federal Rules of Civil Procedure, Rule 54(d)1.

### COUNT SIX: Intentional Infliction of Severe Emotional Distress

   1. Damages in an amount to be determined by the trier-of-fact.

2. Punitive damages in an amount to be determined by the trier-of-fact.

3. Taxable costs pursuant to 29 U.S.C. 216(b), 28 U.S.C. 1920, and Federal Rules of Civil Procedure, Rule 54(d)1.

### COUNT SEVEN: Failure to Pay Wages
### (A.R.S. 23-350 through 355)

1. Damages in an amount to be determined by the trier-of-fact, trebled pursuant to A.R.S. 23-355.

2. Reasonable attorneys fees pursuant to A.R.S. 12-341.01(A) and Federal Rules of Civil Procedure, Rule 54(d)2.

3. Taxable costs pursuant to 29 U.S.C. 216(b), 28 U.S.C. 1920, and Federal Rules of Civil Procedure, Rule 54(d)1.

Respectfully submitted this 7th day of May, 2010.

s/ Kissandra L. Tysman
Kissandra L. Tysman, Attorney for Plaintiff
Tysman Law Firm PLC